IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBIN ALLENBY, | No. C 04-2423 TEH |
| Plaintiff, | |
| v. | **ORDER RE PLAINTIFF'S AND DEFENDANTS' MOTIONS FOR JUDGMENT** |
| WESTAFF, INC., et al., | |
| Defendants. | |

This matter came before the Court on Monday, December 4, 2006, on the parties' cross motions under Federal Rule of Civil Procedure 52 for judgment on the administrative record. Having carefully considered the parties' written and oral arguments, the record herein, and the relevant case law, the Court grants in part and denies in part Plaintiff's motion, and denies Defendants' motion, for the reasons set forth below. The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law pursuant to Rule 52(a).

I. BACKGROUND

Robin Allenby ("Plaintiff") brings this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. 29 U.S.C. § 1001, et seq., seeking to overturn the final determination of Canada Life Assurance Company ("Canada Life")

denying Plaintiff's claim for long term disability benefits. She seeks to recover benefits commencing Monday, June 24, 2002 through the date of judgment.

Plaintiff worked at Westaff, Inc., ("Westaff") as an attorney for approximately 16 years from February 24, 1986 through her retirement on July 1, 2002. She started as a litigation attorney, and was promoted over the years, serving the last six as the General Counsel for the company. In October 2002, Plaintiff submitted her claim for Long-Term Disability Benefits to Canada Life which provides Long Term Disability Insurance for Westaff employees. In her application, Plaintiff seeks disability benefits commencing June 24, 2002 due to repetitive stress injury. Administrative Record ("AR") 187, 813. After Canada Life rejected her claim and appeal, Plaintiff filed the instant suit against Westaff., Westaff, Inc. Long-Term Disability Plan, and Canada Life Assurance Co. (collectively "Defendants"). Plaintiff and Defendants now both move for a judgment in their favor based on the administrative record.

II. STANDARD OF REVIEW

The denial of long term disability benefits is reviewed *de novo* unless the plan or policy expressly confers upon the plan administrator the discretionary authority to determine benefits, in which case the denial will be reviewed for abuse of discretion. *Johnson v. Buckley*, 356 F.3d 1067, 1075 (9th Cir. 2004); *Ingram v. Martin Marietta Long Term Disability Income Plan for Salaried Employees of Transferred GE Operations,* 244 F.3d 1109, 1112-13 (9th Cir. 2001). The parties both agree that in this case no such discretion is expressly conferred upon the plan administrator and thus the denial of benefits is reviewed *de novo*.

When a Court conducts a *de novo* review of an administrator's denial of long-term disability benefits in an ERISA case, the Court effectively conducts a bench trial

2

upon the record. *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1094-95 (9th Cir. 1999). Accordingly, the Court shall proceed under Fed. R. Civ. P. 52(c). *Id.*[1]

### III. POLICY REQUIREMENTS

In order for Plaintiff to establish eligibility for long-term disability benefits from Canada Life,[2] she must establish that she was disabled within the terms of the policy as of June 21, 2002, the last day she actually worked or, at the latest, July 1, 2002, the date she retired. AR 87; *see also* Defs.' Opp. at 1 (Plaintiff can only recover benefits if "she was disabled at the time she retired"). Plaintiff must also show that she remained disabled continuously for a 90-day "elimination period" commencing on the date the disability is established. AR 79.

To establish that she was disabled, Plaintiff must show that, due to sickness or injury, she was:

(1) unable to do the Material and Substantial Duties of her Own Occupation.

(2) receiving appropriate evaluation and treatment from a physician for that injury or sickness, and

(3) her work earnings were less than 20% of her indexed pre-disability monthly earnings.

In this case, the dispute focuses on whether Plaintiff was unable to do the "Material and Substantial Duties of her Own Occupation." "Material and Substantial Duties" are defined as those duties that:

---

[1] Given that the court is conducting a *de novo* review, rather than reviewing the Defendants' decision for abuse of discretion, the Court does not separately discuss the specific rationales advanced by Defendants in their letters denying Plaintiff's claim. *See also* Defs.' Opp. at 8-9 (noting that because the Court reviews the matter *de novo*, Plaintiff's "criticism of Canada Life's handling of her claim and its reasons for denying it is both baseless and irrelevant").

[2] Plaintiff has been receiving disability benefits from her individual disability insurance policy with Unum Provident. She has also been receiving workers compensation benefits during the period in question. AR 277, 579.

3

(a) are normally required for the performance of your Own Occupation and

(b) cannot be reasonably omitted or modified.

"Own Occupation" is defined as follows:

> Own Occupation means the duties that You regularly performed for which You were covered under this Policy immediately prior to the date Your Disability began. The occupation may involve similar duties that could be performed with Your Employer or any other employer.

AR 27, 541, 842.

The Plan's definition of disability changes 24 months after the conclusion of the elimination period. Once this point in time is reached, claimants must establish that they are unable to do the material and substantial duties of not just their "Own Occupation" but of "Any Occupation" which is defined as any occupation "for which they are or may become reasonably qualified by education, training or experience." AR 87-88, 541. These two separate time periods are referred to by the parties as the "own occupation" period and the "any occupation period."

## IV. MEDICAL HISTORY

It is undisputed that Plaintiff worked 8-10 hours a day, and that her position required extensive use of the computer (approximately 6 hours per day) as well as prolonged periods of sitting (for 7-8 hours per day). AR 190, 819. In 2000, Plaintiff began experiencing pain, stiffness, and aching in her neck, shoulders, hands, and wrists. She consulted Dr. William Ross, a sports medicine orthopedist, in March 2001. He diagnosed repetitive stress injury arising out of her work and prescribed physical therapy twice a week. AR 842.

Over the next several months Plaintiff showed improvement and by the Fall reported her condition as 2/10 on a linear pain scale. Her work station was ergonomically assessed and a number of changes were made. AR 265, 296. Nonetheless, Plaintiff continued to have symptoms. AR 265. Dr. Ross concluded,

4

however, that she would continue responding to physical therapy. *See e.g.*, AR 320, 848-49, 322, 852.  By February of 2002, Plaintiff reports that the symptoms were primarily limited to the right side. AR 296.

In the Spring of 2003, however, Plaintiff's recovery stalls and eventually deteriorates.  In May of 2002, there was no "significant improvement" over the last 3 months and she was experiencing daily pain or aching in her neck, shoulder and wrist and right thumb. AR 855, 316.  In June 2002, her physical therapist states that Plaintiff is still complaining of right sided neck stiffness and right shoulder pain, forearms and right thumb aching and notes that the injuries are chronic and seem to be responding slowly. In her declaration, dated April 29, 2004, Plaintiff discusses this period as follows:

> Westaff was involved in major litigation arising from an acquisition. There was a major refinancing of the Company with GE Capital, a six month effort with at least a foot high stack of documents and an international cast of lawyers dealing with subsidiaries. E-mail was essential as the computer-generated documents were prepared and edited. There were lots of conference calls.
>
> While all this was going on my symptoms did not go away.  They worsened.  My right arm hurt reaching for the phone . . . [or] files and papers. . . Picking up a ream of paper to fill the printer hurt.  Picking up and carrying my brief case hurt.  The replacement mouse made it worse. My neck hurt. My shoulder hurt. I was overworked and in pain.
>
> By Spring of 2002, instead of going to the gym after work, I resorted to going during the day to stretch and sit in the Jacuzzi or steam room trying to ease the pain and general discomfort. I was using a heating pad at home before and after work and bringing it to work with me.  I was icing at home.  I had been taking Advil for months.  It did not alleviate the pain.
>
> On Memorial Day weekend in May 2002, my husband and I traveled by plane to Seattle to visit family. I . . . relied on stretches, self massage, my husband's massage and moving about on the plane to ease the discomfort of sitting for the duration of the flight.

AR 266-67.

In June 2002 Dr. Ross reports that "[o]verall, Robin continues to be quite symptomatic on a daily basis.  She is usually very uncomfortable by the end of the workday.  After she has had a day or two of rest, her symptoms are lessened somewhat." AR 267.  In mid-July, Dr. Ross states that Plaintiff's daily pain level was down to a 3

5

*after* having stopped work for three weeks and that "[p]reviously it had been at approximately a 4 or 5 level." AR 299.

At the advice of Dr. Ross, Plaintiff took a 6 week leave from work commencing Monday, June 24, 2006. It was Plaintiff's understanding, however, that she "would have no job unless [she] could resume [her] regular duties within six weeks." AR 268. After the first week of her leave, Plaintiff concluded that, given the state of her condition despite months and months of intensive physical therapy, that there was "no way [she] was going to be well in the six weeks required by the CEO." AR 270. Accordingly, on July 1, 2002, she retired as a "polite way of saying I quit." AR 271. She states that she felt "physically compelled to quit," *id.,* although she also indicated in her retirement letter to the company that she also wanted to spend more time with her family. AR 707.

In August and October 2002, two separate doctors independently examined Plaintiff: (1) Dr. Ross (her treating orthopedist), and (2) Dr. Anita Roth, a specialist in physical medicine and rehabilitation who performed a "Qualified Medical Examination." Both determined that Plaintiff suffered from work induced repetitive stress injury (including deQuervain's, chronic cervical sprain, tendinitis), AR 827, 830, and that she could not use the computer longer than 30 minutes or sit for longer than 30 minutes. AR 831-32. They further both found that she was disabled and/or could not return to her usual and customary work duties. AR 827, 830. Both doctors found that while other objective indicators were negative, Plaintiff tested positive on the Finkelstein bilaterally. AR 826, 830.

Thereafter, Plaintiff continued with various physical therapy treatments and a doctor-prescribed treatment known as Hellerwork but continued to be symptomatic . In May 2003, Dr. Ross concluded that Plaintiff's condition was essentially unchanged and stated that while her neck area is "perhaps somewhat improved. . . [t]he shoulder and scapular areas continue to be aching." He concludes that she is "clearly permanent and stationary" and that she "needs to accept her problem and move on with her life. She is

still disabled." AR 312.  Plaintiff asked Dr. Ross for, and later received, a referral to a neurologist.  AR 273.

In August 2003, Plaintiff was examined by a neurologist, Dr. Newkirk, who began treating her thereafter.  He concluded that Dr. Ross and Dr. Roth had missed the fundamental source of Plaintiff's injuries. AR 366-67.   Specifically, he found that Plaintiff has a very thin, narrow  thorax, which is congenital. AR 341, 367.   He further gives the opinion that (1) as a result of this congenital condition, (2) an improperly configured work station which led to a poor, round shouldered posture, and (3) working with her arms in front of her body for extended periods, she developed a chronic compression of the nerves and blood vessels in the superior thoracic aperture. AR 341, 350, 367. *See also id.* at 350 ("Accumulated edema plus bony compression of the neurovascular bundles in the superior thoracic aperture have created continuous venous and possibly some arterial compression that does not reverse in time due to the severity). The symptoms resulting from this syndrome, referred to as thoracic outlet syndrome, *see* AR 351, can include pain in the areas experienced by the Plaintiff. AR 340-41, 367.  Dr. Newkirk's diagnosis was confirmed by a sonogram  taken in March 11, 2004. AR 361. He notes that the syndrome, "which appears to have fixed itself for the last 2 ½ years" has progressed to an advanced degree and that the Plaintiff now has pain in many ordinary daily activities and can not type at all. AR 340.  The administrative record does not contain any evidence disputing Dr. Newkirk's opinions or diagnosis.

V. DISCUSSION
    A. Whether Plaintiff was disabled during the "Own Occupation" period
        1. Whether Plaintiff was disabled as of July 1, 2002.

In order to be eligible for benefits, Plaintiff must demonstrate that she was disabled no later than July 1, 2002, the date she retired.  As such. Plaintiff must thus show, that as of July 1, 2002, she could no longer do the  "Material and Substantial Duties" of her job, which are those duties that:

7

(a)  are normally required for the performance of her occupation and

(b) cannot be reasonably omitted or modified.

(a) *Duties normally required*

While reasonable persons could differ, looking at the record *de novo*, the Court concludes that the Plaintiff has shown, by a preponderance of the evidence in the administrative record, that she could no longer do the duties that are normally required for the performance of her occupation as of Friday, June 21, 2002, the last day she actually reported for work.

The Court concludes that Plaintiff was misdiagnosed (or underdiagnosed) in 2001, and was in fact suffering from thoracic outlet syndrome, which is consistent with the fact that despite months and months of intensive physical therapy treatments for repetitive stress injury, along with icing, heating treatments, and anti-inflammatories, Plaintiff was unable to overcome her symptoms. As Dr. Newkirk explains, given that her neurovascular compression syndrome was not recognized early on, adequate corrections were not made to the work station, and her treatment course was unsuccessful because it did not begin to reverse the anatomic basis of her disorder. AR 340, 345.

Defendants argue that Dr. Newkirk's diagnosis is irrelevant and should be ignored because he did not examine or treat Plaintiff during the "relevant time period." *See* Defs.' Opp. at 9. Defendants, however, do not cite any authority for the proposition that courts must ignore a later diagnosis because it was not made contemporaneously with the date of the claimed disability. Indeed, such a rule would penalize anyone who is not properly diagnosed by the initial treating physician(s). Further, it is within a physician's normal exercise of his or her duties to make medical judgments about the onset or cause of a condition, disease, or set of symptoms based on a current examination and review of medical history. The Court also notes that the time gap at issue (between

June 2002 and Dr. Newkirk's August 2003 examination of Plaintiff) is not a lengthy one of five or ten years but roughly 14 months.

Plaintiff has also shown that it is more likely than not that she was suffering sufficient pain and discomfort from the neurovascular compression – as of June 21, 2002 – to support the conclusion that she could no longer do the normal duties of her job at that point in time. Significantly, Plaintiff credibly presented to both Dr. Ross and Dr. Roth in August and October 2002. In turn, they both independently concluded, based on Plaintiff's statements and the objective findings of a positive Finkelstein test, that Plaintiff could not use a computer or sit for longer than 30 minutes and could not return to her usual and customary duties. The fact that Drs. Ross and Roth failed to identify more objective findings to support these conclusions is less significant given Dr. Newkirk's diagnosis and objective findings, as well as the sonogram. Further, if Plaintiff could not type or sit for more than 30 minutes in August or October 2002 it is logical to conclude that she also could not perform such functions just a few months earlier, in June 2002, particularly given that there is no dispute that Plaintiff's symptoms were caused or exacerbated by her work duties.[3]

Defendants argue that just because Plaintiff was in "some pain" at work that this does not render her disabled. The Court agrees that a minor amount of discomfort or pain does not render someone disabled. The Court is satisfied, however, that by June 21, 2002, Plaintiff was – despite having had some 60 physical therapy treatments – experiencing chronic pain and discomfort, even with icing, heating, breaks, and anti-

---

[3] Defendants emphasize that back in June of 2002, Dr. Ross envisioned that Plaintiff would recover after a 6-week leave and be able to return to work full time thereafter. As such, they argue, Dr. Ross did not believe that Plaintiff was disabled as of June 2002. The Court concludes, however, as set forth above, that Dr. Ross had not accurately diagnosed Plaintiff's condition, and thus had underestimated the nature of the problem. Further, Dr. Ross' projection was clearly wrong as he concluded in October 2002 that Plaintiff could not return to work even though she had been off work for over three months at that point. In short, Dr. Ross' misguided belief in June 2002 that Plaintiff only needed a temporary leave from work is not a persuasive basis for denying benefits. *See also Mixen*, 442 F.Supp.2d 903 (overturning denial of benefits which relied in part on physician's erroneous belief that the plaintiff would recover and be able to return to work).

9

inflammatories, that was more than just a minor inconvenience or annoyance, and that her condition did in fact sufficiently interfere with her ability to work that she understandably felt "compelled" to quit.

Defendants also argue that Plaintiff can not establish that she was unable to do her normal duties as of June 21, 2002 because she was in fact working up until this point in time, and thus was necessarily performing the duties normally required for her occupation. The Courts, however, have rejected the argument that plaintiffs are precluded from establishing that they were disabled because they were in fact working. In *Locher v. Unum Life Insurance Co. of America*, 389 F.3d 288 (2nd Cir. 2004), for example, the Court held that such an approach would put employees in a "Catch 22" because "those claimants who were working could not be considered disabled and yet claimants who had stopped working would not be covered under the Plan." *Id.* at 297. "Certainly," the Court continued, "claimants who can establish absences and resignation based upon an inability to continue working should be able to claim that their disability prevented them from performing the duties of their occupation." *See also Mixon v. Metropolitan Life Ins.*, 442 F. Supp.2d 903, 909 (C.D. Cal. 2006) ("The fact that [the plaintiff] was physically at work does not refute the fact that she was disabled on that date -and earlier"). Indeed, the fact that a claimant might literally be able to perform job duties, albeit while enduring significant pain, should not preclude a finding of disability.

Finally, Defendants argue that Plaintiff reported that her condition was improving in the period before her claimed disability, and therefore the record does not support a finding of disability. It is true that Plaintiff did initially respond favorably to the physical therapy. The record also indicates, however, that in the Spring of 2002, this improvement stalled and that, as described above, Plaintiff became more symptomatic in the period immediately prior to June 21, 2002. Accordingly, and for all of the reasons set forth above, the Court concludes that Plaintiff has shown that, as of June 21, 2002, she could not perform those duties "normally required for the performance" of her own occupation.

*b. Duties that cannot be reasonably omitted or modified*

As noted above, the definition of "Material and Substantial Duties" has a second component. Specifically, "Material and Substantial Duties" are those that are "normally required" *and* "cannot be reasonably omitted or modified. Defendants argue that this language requires the Plaintiff to show not only that she can't perform the "normally required" duties but that the duties can't either be omitted or "modified" in some way to allow performance. This interpretation appears reasonable.

Plaintiff argues that the language doesn't mean that the court must look at whether the normally required job duties could be done with modifications – it just means that a duty is only "material and substantial" if it "can't be modified." This interpretation makes little sense. Whether a duty is "material or substantial" to a job does not logically turn on whether or not it can be modified. Plaintiff also relies on *Saffle v. Sierra Pacific Power Co. Bargaining Unit Long Term Disability Income Plan*, 85 F.3d 455, 459 (9th Cir. 1996) for the proposition that it would be error to graft an "accommodation" requirement into the Canada Life policy. *Saffle* is inapposite, however, because the policy language at issue was completely different – defining disability simply as the inability to perform "each and every duty." Here, the policy language expressly includes a modification provision. Accordingly, the Court turns to whether Plaintiff could have performed her normally required duties with "modifications."

On this point, Defendants argue that Plaintiff could have continued doing her job with modifications. They note that Westaff stated on the "Disability Claim Employer Statement" form that Plaintiffs' job could be modified with "reasonable accommodations." AR 186. The form does not, however, identify any specific accommodations that would have been acceptable to Westaff, and Westaff had already tried ergonomic adjustments without success. *See e.g.* AR 829 ("no resolution with ergonomic adjustments"). Defendants emphasize that Dr. Ross noted in October 2002 that Plaintiff could return to a job involving computer use if she was able to use voice

11

recognition software to operate the computer. AR 426. The only evidence in the record regarding the actual efficacy of this modification, however, is Plaintiff's declaration in which she concludes, after trying such a program, that it was "unsuitable for editing work because of the time and frustration in dictating simple corrections in the text. Heavy editing of documents, which was what I did as a lawyer, in my opinion was difficult and inefficient." AR 274.

Even putting aside the voice technology issue, however, Dr. Newkirk states that the pain caused by the thoracic outlet syndrome is exacerbated or "*aggravated* by *any work in front of the body above lap level* and much more at or above shoulder level." AR 342 (emphasis added). It is difficult to imagine working in Plaintiff's "own occupation" as a general or corporate counsel – either for Westaff or another legal employer – without doing work in front of the body above lap level since many tasks involved in almost any professional desk job involve movement of the arms in front of the body above lap level. An employee is not required to continue working if to do so would aggravate or worsen the medical condition at issue. *See e.g. Herring v. Canada Life Assur. Co.*, 207 F.3d 1026, 1028, 1031 (8th Cir. 2000) (upholding grant of benefits to employee where, *inter alia*, district court had concluded that a stressful work environment would aggravate or worsen employee's fibrositis).[4] Accordingly, and for all of the reasons set forth above, this Court concludes that Plaintiff has shown that she was disabled from performing the "material and substantial duties of her own occupation" as of June 21, 2002.

### 2. Whether Plaintiff Satisfies the 90-Day Elimination Period

Once a claimant demonstrates that s/he is disabled as of a specific date, s/he must also establish that the disability was continuous for 90 days thereafter. Defendants argue

---

[4] In addition, Drs. Ross and Roth both found that Plaintiff could not sit for more than 30 minutes. Given that Plaintiff's position involved sitting 7-8 hours per day, AR 190, 819, and that most corporate or general counsel jobs involve lengthy amounts of time sitting at a desk, it is unclear what modifications would address this issue; nor have Defendants identified any such modification.

12

that Plaintiff can not satisfy this 90-day elimination period requirement because the reports from Dr. Ross and the physical therapist indicate that Plaintiff improved following her resignation. For example, Plaintiff's July 22, 2002 physical therapy status report states that Plaintiff has continued physical therapy twice weekly and "feels like she is making progress now with decreased symptoms." AR 325. The report also states, however, that Plaintiff "continues to complain of right shoulder pain, right thumb, neck stiffness. cervical spine stiffness, forearm and wrist stiffness and aching." Moreover, Defendants have not disputed that Plaintiff's symptoms were caused and/or aggravated by the performance of her work duties. Thus, while the Court agrees that Plaintiff experienced a reduction of symptoms during the first few months after she stopped working, this is to be expected and does not demonstrate that she was no longer disabled from returning to the duties of her "own occupation." Notably, it was during this time period or immediately thereafter that both Drs. Ross and Roth found that Plaintiff was precluded from returning to her work.

### 3. The remainder of the "Own Occupation" period

As noted above, the "own occupation" period covers the first 24 months after the 90-day elimination period is over, which in this case consists of the period June 21, 2002 through on or about September 21, 2004. Defendants argue only that Plaintiff was not disabled as of June 21, 2002 or July 1, 2002, the day she resigned, and that she did not satisfy the 90-day elimination period. They do not argue that she can not satisfy the policy requirements with respect to the remainder of the "own occupation" period. Accordingly, Defendants implicitly concede that if the Court finds that Plaintiff was disabled as of July 1, 2002 and satisfied the 90-day elimination period, that she would qualify as disabled for the remainder of the "own occupation" period.

Such a conclusion also finds support in the record. For example, in September 2003, Dr. Newkirk states that Plaintiff's condition has "progressed to the point that she has numbness, tingling, pain and even weakness *at rest* aggravated by forward reaching,

13

driving, writing or typing, side-lying while sleeping at night or with any reaching at or above shoulder level." AR at 344 (emphasis added); *id* at 340 ("Now that her syndrome has progressed to such an advanced degree, she experiences significant pain in many ordinary daily activities such as dressing, meal preparation and driving, simple manipulation of light objects. She is precluded totally from typing at this time."); *see also* AR 359, 361 (Report by Dr. Newkirk finding Plaintiff disabled through August 1, 2004).

### 3. Conclusion

For all of the reasons set forth above, the Court concludes, after a *de novo* review of the Administrative Record, that Plaintiff has demonstrated, by a preponderance of the evidence, that she is entitled to Long Term Disability Benefits under the policy with respect to the "own occupation" period.

### B. Whether Plaintiff was disabled during the "any occupation" period

Plaintiff contends that this Court should also find that Plaintiff has been disabled during the "any occupation" period which starts at the conclusion of the "own occupation" period. As noted above, a different disability definition governs this period. It is appropriate for Canada Life to have an opportunity to address this issue in the first instance. *Saffle*, 85 F.3d at 460. Accordingly, the Court agrees with Defendants that Plaintiff's claim for benefits during the "any occupation" period should be remanded to the Plan Administrator for consideration in light of the Court's rulings on these motions.

## VI. CONCLUSION

In light of the foregoing, and good cause appearing, it is HEREBY ORDERED that:

1. Plaintiffs' Motion for Judgment On the Administrative Record under Fed. R. Civ. P. 52(c) is granted in part and denied in part consistent with this Order.

14

2. Defendants' Motion for Judgment is denied.

3. The Court finds that Plaintiff is eligible to recover Long Term Disability Benefits under the Canada Life policy at issue with respect to the "own occupation" period.

3. Plaintiff's claim for benefits during the "any occupation" period is remanded to Canada Life for decision "within a reasonable time." *Saffle*, 85 F.3d at 461.

4. The parties shall, within 30 days of the date of this Order, (a) meet and confer to resolve the specific amount of disability benefits due Plaintiff for the "own occupation" period, including interest, and less any appropriate set-offs, and (b) submit a proposed judgment, which is approved as to form by Defendants, that is consistent with this Order.

**IT IS SO ORDERED.**

Dated:   December 12, 2006

THELTON E. HENDERSON
UNITED STATES DISTRICT JUDGE